In re Petition of **Anthony James McMA-HON and Roger Smith, as Joint Provisional Liquidators of English & American Insurance Company Limited, Debtor in Foreign Proceedings.**

**Anthony James McMahon and Roger Smith, as Scheme Administrators of English & American Insurance Company Limited, Plaintiffs,**

v.

**Providence Capitol Enterprises, Inc., Defendant.**

**No. 97 CIV. 8536(SAS).**

United States District Court, S.D. New York.

Nov. 30, 1998.

528

See also 222 B.R. 205.

Gregory M. Petrick, Kenneth P. Coleman, Cadwalader, Wickersham & Taft, New York City, for Plaintiffs.

David L. Katsky, Adrienne B. Koch, Esq., Judith M. Shampanier, Esanu Katsky Korins & Siger, LLP, New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs, Scheme Administrators[1] of English & American Insurance Company Ltd. ("E & A"), seek a declaratory judgment that Defendant, Providence Capitol Enterprises, Inc. ("PCE") is liable for approximately $65 million pursuant to a guarantee it signed as part of a series of agreements among E & A, PCE and related entities on January 27, 1986. Under its terms, Defendant guaranteed the performance of its then-affiliate, Providence Capital Insurance (Channel Islands) Limited ("CIL"), under a retrocessional reinsurance agreement, and further undertook to indemnify E & A in the event CIL failed to perform under that agreement. Defendant PCE now moves for summary judgment dismissing the complaint, asserting that Defendant's obligations have lapsed.

Jurisdiction is predicated on 28 U.S.C. §§ 1334(b) and 157(a). In addition, on January 31, 1995, the Bankruptcy Court for the Southern District of New York ordered that the Scheme of Arrangement be given full force and effect in the United States and issued an order by which this Court retains jurisdiction with respect to "requests for any additional relief in the case filed under section 304 of the Bankruptcy Code and all adversary proceedings in connection therewith properly commenced and within the jurisdiction of this Court." *See* Permanent Injunction Order, dated January 31, 1995.

## I. Standards on a Motion for Summary Judgment

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997). While the court's role on a motion

for summary judgment is to assess whether there are any factual issues to be tried, rather than to resolve disputed issues of fact, "the court resolves all ambiguities and draws all reasonable inferences against the moving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Schwapp,* 118 F.3d at 110. If the movant meets this burden, the party opposing the motion must come forward with specific evidence that is more than "mere speculation or conjecture," *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990), but "would be sufficient to support a jury verdict in its favor." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). If the opposing party "propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *See Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9–10 (2d Cir.1983). Thus, a summary judgment motion should not be granted unless "reasonable minds could not differ as to the import of the evidence before the Court." *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990).

The court must also examine "the substantive law applicable to the underlying litigation since that law dictates which facts are material." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993) *(citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). When a motion for summary judgment centers on the interpretation of contractual terms, the court's ability to grant the motion turns on whether the relevant terms are ambiguous. The threshold determination as to ambiguity is one of law based solely upon the court's reading of the terms at issue. *See United States Fire Ins. Co. v. General Reins. Corp.,* 949 F.2d

---

**1.** Scheme Administration is the English analog of U.S. bankruptcy proceedings.

569, 571 (2d Cir.1991); *Care Travel Co. v. Pan American World Airways,* 944 F.2d 983, 988 (2d Cir.1991).

A court will deem contract language unambiguous when "it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Care Travel Co.,* 944 F.2d at 988 (*quoting Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989) (*in turn quoting Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978))). If the relevant contract terms are determined to be unambiguous, the court may construe the legal meaning of those terms without resort to extrinsic evidence. *Care Travel Co.,* 944 F.2d at 988; *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990).

Where, conversely, the Court determines that "contract language is susceptible of at least two fairly reasonable interpretations, there is a triable issue of fact and summary judgment is inappropriate." *American Home Assur. Co. v. Baltimore Gas & Elec. Co.,* 845 F.2d 48, 51 (2d Cir.1988).

## II. Background [2]

E & A is a United Kingdom insurance company that specialized in reinsuring risk in the London market for United States- and Japan-based companies. The High Court of Justice of England and Wales in London, England sanctioned a Scheme of Arrangement for E & A on January 25, 1995. Pursuant to this Arrangement, Plaintiffs, as Scheme Administrators, ad-

minister the assets of E & A for the benefit of the estate's policyholders and other creditors. Defendant PCE is a Delaware corporation with operations in Colorado and New York. It serves principally as an investment holding company. *See* Affidavit of Gregory M. Petrick, Plaintiffs' Attorney ("Petrick Aff."), at Ex. L, Deposition Transcript of Paul Dupee (lead negotiator for PCE), at 13–22.

The parties dispute the meaning and legal significance of a complex series of agreements, companion agreements and side agreements executed on or about January 27, 1986. An illustration, attached hereto as Exhibit A, graphically depicts the agreements between the parties. First, E & A entered into an agreement ("the Reinsurance Agreement") with Providence Capitol Life Assurance Company Limited ("PCLA") pursuant to which E & A agreed to reinsure PCLA for a particular book of business ("the Portfolio"). *See* Plaintiffs' 56.1 Statement ("Pls' 56.1 Stmt.") at ¶ 1; Defendant's 56.1 Statement ("Def's 56.1 Stmt.") at ¶ 1. Among other provisions, this agreement obligated E & A to accept 100% of the insurance liability for the Portfolio in exchange for certain "premiums" paid by PCLA to E & A.

Concurrently, E & A entered into an agreement with CIL ("the Retrocessional Agreement") in which CIL agreed to assume many of the rights and obligations of E & A concerning the Reinsurance Agreement.[3] *See* Pls' 56.1 Stmt. at ¶ 2; Def's 56.1 Stmt. at ¶ 2. By entering into the Retrocessional Agreement, E & A effectively limited its exposure, transferring the liability to CIL except as to the "First Portion." Article I of the Retrocessional Agreement provided that the agreement would "follow all terms and conditions of

---

**2.** For further background information, in the context of PCE's Motion to Withdraw Reference, *see McMahon v. Providence Capitol Enterprises, Inc.,* 222 B.R. 205 (S.D.N.Y.1998).

**3.** Specifically, CIL reinsured E & A as to 100% of its liability "in excess of the First Portion" under the reinsurance Agreement.

The "First Portion" is defined in Article I of the Retrocessional Agreement and is based on the amount of premiums paid by PCLA to E & A under the Reinsurance Agreement, together with any investment income therefrom, subject to deductions for certain payments and taxes.

the [Reinsurance] Agreement and shall apply only to that business which is subject to the [Reinsurance] Agreement (subject as provided in Article XII)." The Retrocessional Agreement was thus entirely dependent upon the Reinsurance Agreement except to the extent that Article XII provided otherwise.

Article XII, in turn—and the clauses primarily at issue in this dispute—provides that:

> The parties hereto [E & A and CIL] acknowledge that the business which is the subject of the [Reinsurance] Agreement may ultimately be transferred by [PCLA] to [E & A] pursuant to a transfer approved by the Secretary of State for Trade and Industry under Section 51 of the Insurance Companies Act 1982

> The parties hereto agree that if such transfer shall take place this Agreement shall continue in full force and effect mutatis mutandis in relation to the said business albeit that the liability of [E & A] shall then arise by virtue of the said transfer rather than by virtue of the [Reinsurance] Agreement

> On or before the date upon which such transfer shall be completed the parties hereto [E & A and CIL] shall enter into an addendum to this Agreement in such form as [E & A] shall reasonably require in order to give full effect to the above acknowledgment and agreement and any consequential alterations required to this Agreement by virtue of the transfer

As explicitly contemplated by these agreements, the British Secretary of State for Trade and Industry, acting pursuant to Section 51 of the Insurance Companies Act 1982, approved the transfer of the Portfolio in early 1988 ("the Section 51 Transfer"). *See* Pls' 56.1 Stmt. at ¶ 5; Def's 56.1 Stmt. at ¶ 5. Thus, the Portfolio that was originally the subject of the reinsurance arrangement between E & A and PCLA became directly insured by E & A.

In a third important agreement, also dated on or about January 27, 1986, E & A, PCE and Providence Capitol Limited ("PCL") executed a guarantee ("the Guarantee") obligating PCL, as parent company to CIL, to ensure that CIL performed its obligations under the Retrocessional Agreement and to indemnify E & A against all losses, damages, costs and expenses incurred by E & A should CIL fail in its obligations. The Guarantee further specified that in the event PCL was liquidated, PCE would assume PCL's obligations. *See* Pls' 56.1 Stmt. at ¶ 3; Def's 56.1 Stmt. at ¶ 3.

PCL was liquidated on December 17, 1986. *See* Pls' 56.1 Stmt. at ¶ 4; Def's 56.1 Stmt. at ¶ 4. Therefore, if PCL's obligations to E & A remained viable under the Guarantee, PCE assumed those obligations and became obligated to E & A.

The parties do not dispute that these agreements are governed by English law. *See* Pls' 56.1 Stmt. at ¶ 7; Def's 56.1 Stmt. at ¶ 7. Defendant PCE argues, as a matter of English law, that the obligations it allegedly guaranteed have lapsed.

## III. Controlling English Law

 "Determination of a foreign country's law is an issue of law." *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir.1998). *See* Fed.R.Civ.P. 44.1. To assist the Court, both parties obtained opinions of English counsel setting forth the legal arguments in support of their positions. The parties deposed and examined the authors of each of these opinions, and also provided their deposition transcripts to the Court. While the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence," Fed.R.Civ.P. 44.1, as with domestic law, judges may rely on both their own research and the evidence submitted by the parties to determine foreign law. *See Batruk v. Mitsubishi Motors Corp.*, Nos. 94 Civ. 7593, 94 Civ. 8677,

1998 WL 307383, at *3 (S.D.N.Y. June 10, 1998) (*citing Ackermann v. Levine,* 788 F.2d 830, 838 n. 7 (2d Cir.1986)); *accord Curtis v. Beatrice Foods Co.,* 481 F.Supp. 1275, 1285 (S.D.N.Y.1980), *aff'd,* 633 F.2d 203 (2d Cir.1980).

■ Both parties agree that under English law, as under American law, contracts are interpreted according to their plain and ordinary meaning. *See* Plaintiffs' Memorandum of Law ("Pls' Memo."), *citing Investors Compensation Scheme Ltd. v. West Bromwich Bldg. Soc'y* [1998] 1 W.L.R. 896, 904C ("it is, after all, from the words used that one must ascertain what the parties meant"); Defendant's Memorandum of Law ("Def's Memo."), *citing Eastern Counties Building Society v. Russell* [1947] 1 ALL ER 500, 503 ("[t]he whole instrument, as it stands, must be construed so as to give effect to the intention of the parties discovered from the actual terms agreed by the parties and employed by them in the written instrument as expressing what they intend to agree."). Both parties rely on the leading English treatise on contracts, *Chitty on Contracts,* which states:

> The cardinal presumption is that the parties have intended what they have in fact said, so that their words must be construed as they stand. That is to say, the meaning of the document or of a particular part of it is to be sought *in the document itself:* "One must consider the meaning of the words used, not what one may guess to be the intention of the parties." However, no contract is made in a vacuum. In construing the document, the court may resolve an ambiguity by looking at its commercial purpose and the factual background against which it was made.

*I Chitty on Contracts,* ¶ 12–040 (27th ed.1994) (citations omitted) (emphasis in original).

■ Both parties also agree that in determining the meaning of the language

of a commercial contract, English law generally favors a commercially sensible construction. A commercial construction is more likely to give effect to the intention of the parties than "too nice a concentration on individual words." *Id.* Words are therefore interpreted in the way in which a reasonable commercial person would construe them. *See* Report of Plaintiffs' expert Michael Crystal (the "Crystal Opinion"), *citing Mannai Investment Co. Ltd. v. Eagle Star Life Assurance Co. Ltd.* [1997] 2 W.L.R. 945, 964C–965A (per Lord Steyn); Defendant's Reply Memorandum of Law ("Def's Reply Memo.") at 3 and Deposition Transcript of Defendant's expert Thomas Mowschenson (the "Mowschenson Tr.") at 111 (agreeing with this principle).

Thus, both parties agree that the appropriate way to determine the meaning of Article XII is to examine the language negotiated and used by the parties in light of the business purposes they sought to achieve. Where the parties disagree, however, is as to what text and what scope of factual background are necessary to resolve the meaning and requirements of Article XII. PCE points to specific language in Article XII and the factual matrix surrounding this language to support its position that its guarantee obligations have expired. E & A points to broader text and a consequent broader factual matrix to support its contention that PCE remains liable under the Guarantee.

## IV. The Parties' Interpretations of the Text and the Factual Background

### A. PCE's Argument

■ PCE argues that as a matter of English law, it is not liable under the Guarantee because, when the Portfolio liabilities were transferred from PCLA to E & A, the parties to the Retrocessional Agreement (E & A and CIL) did not execute an addendum to that Agreement as provided for in Article XII.[4]

---

4. Both parties concede that no addendum has been produced. E & A suggests that since

Under the Guarantee, PCE's obligations were dependent upon CIL failing to perform under the Retrocessional Agreement. The scope of the Retrocessional Agreement, in turn, was limited to matters covered by the Reinsurance Agreement. When the Reinsurance Agreement lapsed by virtue of the Section 51 Transfer, the Retrocessional Agreement and the Guarantee lapsed as well. Article XII, by allowing for an addendum, provides the single exception to this limitation. CIL (and therefore PCE) had no obligations under the Retrocessional Agreement unless, according to the plain language of Article XII, "[o]n or before the date upon which such transfer shall be completed the parties hereto shall enter into an addendum . . ." The failure to execute an addendum, PCE argues, relieves it of its obligations.

The thrust of PCE's argument is a textual one. PCE argues that inclusion of the word "shall" in the phrase "the parties hereto shall enter into an addendum" obligated the parties to enter into an addendum. According to its ordinary meaning, "shall" is a mandatory directive. Therefore, when the parties said they "shall" enter into an addendum they meant they "will" enter into an addendum or the Retrocessional Agreement will lapse at the time of the Section 51 Transfer. PCE argues that any interpretation that reads this language as permissive rather than mandatory converts "shall" into "may," contravening the ordinary meaning of this term and effectively rewriting the contract the parties actually negotiated.

Similarly, the parties explicitly required the execution of an addendum "on or before" the date of the Section 51 Transfer. The scope of the Retrocessional Agreement encompassed "only . . . that business which is subject to the [Reinsurance] Agreement." Therefore, unless the Retrocessional Agreement were modified simultaneously with or prior to any transfer, the entire Portfolio would be beyond the scope of the Retrocessional Agreement.

PCE further argues that reasonable commercial purposes support this interpretation of the text and caused the parties to include this language requiring, not just authorizing, an addendum. Because the parties recognized that the Section 51 Transfer was a significant event which altered the relationships set forth in the Retrocessional Agreement and related documents, the parties expressly stated that an addendum was required "to give full effect" to the agreement and to provide for "any consequential alterations" that would be "required." *See* Petrick Aff., at Ex. C, Retrocessional Agreement, Article XII. Thus, for example, executing an addendum would ensure that CIL could calculate its potential and actual liability to E & A and that such liability would be minimized.

Further, PCE points to important administrative matters resulting from the Section 51 Transfer requiring the execution of an addendum, including the need for reports used to calculate potential and actual liability. These report were previously provided by PCLA and would now need to be provided from some other source.

■ Finally, PCE argues that if the language in Article XII requiring an addendum is ambiguous, this ambiguity should be resolved in its favor as a matter of law. In English law the *contra proferentem* (against the drafter) rule is applicable to ambiguous contract provisions.

discovery is not complete, one may yet surface and be produced as discovery continues. Because Plaintiffs are Scheme Administrators of E & A and thus have unfettered access to E & A's files, they have in their possession or control all information necessary to determine whether an addendum exists or not. The liquidators of E & A cannot, therefore, oppose summary judgment based on the need for further discovery where the information is already available to them as the non-moving party. *See Mason Tenders Dist. Council Pension Fund v. Messera,* 4 F.Supp.2d 293, 306 (S.D.N.Y.1998). Thus, I must conclude that the parties did not execute an addendum.

PCE concedes that to the extent textual ambiguities exist, they exist in Article XII (part of the Retrocessional Agreement). Nonetheless, PCE argues, because the obligations under the Guarantee require reference to CIL's liability under the Retrocessional Agreement, ambiguities in that Agreement should be incorporated into the Guarantee. PCE then argues that under the English law's use of the *contra proferentem* rule, ambiguities in a guarantee should be construed in favor of PCE as the guarantor. *See Coghlan v. S.H. Lock* [1987], 3 BCC 183, 189; *Eastern Counties Building Society v. Russell* [1947] 1 ALL ER 500, 503.

## B. E & A's Argument

E & A argues that rather than focusing on a particular instance of the word "shall," a complete reading of the agreements, or even a complete reading of Article XII, clarifies the intent of the parties.[5] E & A responds to PCE's arguments by offering a different interpretation of the text at issue and a different understanding of the factual matrix that informs this text. It is important to note that PCE admits, in its Reply Memorandum, several key premises of this interpretation. *See* Def's Reply Memo. at 4, admitting for purposes of this motion Pls' 56. 1 Stmt. at ¶¶ 11—14.

E & A argues that the plain language of Article XII reveals that the parties did not intend to make the continuation of the arrangement conditional upon the execution of an addendum. The purpose of the Article XII language, when understood in context with the other agreements, was to ensure that E & A could, if necessary, obligate CIL to negotiate an addendum to ensure that the Retrocessional Agreement remained in effect. Thus, Article XII authorizes, but does not require, an addendum. If E & A did not feel the need to compel CIL to enter into an addendum, as

the text of Article XII empowered it to do, no addendum was necessary.

Nor, to E & A's understanding, did the text of Article XII require E & A to execute a pro forma addendum, devoid of substantive terms, simply to prevent a wholesale reallocation of liabilities—E & A accepting full, unlimited liability for PCLA's business, CIL accepting none—as a result of the Section 51 Transfer. If anything, E & A argues, the plain language of Article XII, the structure of the surrounding agreements, and the commercial purposes behind the transaction demonstrate that this was the one result foreclosed by the parties. E & A argues that to ignore this and accept PCE's interpretation requires a repudiation of the fundamental business purposes motivating the agreements.

E & A argues that had this business proposal been suggested by and negotiated with an arms-length third-party, it would not have entered into the arrangement. Rather, as PCE concedes, E & A agreed to enter into the transaction as an accommodation to E & A's 50% shareholders, Paul Dupee ("Dupee") and Donald Gaston ("Gaston"). *See* Pls' 56.1 Stmt. at ¶ 12; Def's Reply Memo. at 4.

The other major entities in this dispute, PCL, PCLA, PCE and CIL, were all owned and controlled, either directly or indirectly, by Dupee and Gaston. The parties constructed this complicated series of transactions to accommodate the interests of Dupee and Gaston in disposing of the life insurance business of PCLA. The acquirer of the business, Old Mutual, a South African insurer, would only agree to the transaction if it were clear that the life insurance business of PCLA could be transferred free and clear of any contingent liability from the general business. *See* Pls' 56.1 Stmt. at ¶ 11; Def's Reply Memo. at 4.

---

**5.** In fact, the word "shall" is used several times in Article XII. PCE argues that only one of these occurrences conveys a mandatory

meaning. PCE concedes that "shall" can at times be used interchangeably with "may." *See* Mowschenson Tr. at 22–25.

■ Old Mutual insisted that PCLA use its best efforts to have the United Kingdom's Department of Trade and Industry approve a statutory transfer of the general business pursuant to Section 51 of the Insurance Companies Act 1982. If the Section 51 Transfer were approved, PCLA's liability on the general business would be transferred to another insurer by operation of law. It was not known at the time whether the statutory approval would be obtained, or how much time it would take to achieve. Accordingly, as a contingency plan, Dupee and Gaston sought to reinsure PCLA's general business.[6] The reinsurance arrangement would provide comfort to Old Mutual that PCLA would meet its obligations.

Gaston and Dupee could not reinsure PCLA's general business directly with their other Providence Capitol subsidiaries because PCL was about to enter liquidation proceedings in Bermuda and CIL did not have a sufficient balance sheet to take on the risk. As a result, Gaston and Dupee sought to interpose E & A between PCLA and the Providence Capitol interests because E & A had a significant balance sheet. Under the structure proposed by Dupee and Gaston, PCLA reinsured its general liability with E & A. Because E & A had agreed to accept only a limited exposure on PCLA's general business, PCLA arranged to have it reinsured again by retrocessional insurance to CIL. CIL, however, was not a substantial company. E & A, therefore, required Gaston and Dupee to back-up the retrocessional reinsurance with PCE's guarantee.

Thus, neither E & A nor Dupee and Gaston's Providence Capitol interests viewed CIL as critical to the transaction.

CIL appears to have been put into the transaction only so that the structure would appear to be that PCE was guaranteeing a reinsurance obligation of its subsidiary rather than providing a straight guarantee of E & A's insurance. *See* Pls' 56.1 Stmt. at ¶ 13; Def's Reply Memo. at 4.

■ Article XII anticipates the approval of the Section 51 Transfer and acknowledges that "this Agreement shall continue in full force and effect mutatis mutandis ..."[7] after the Transfer. The next paragraph of Article XII authorizes E & A to require CIL to enter into an addendum to make whatever "consequential alterations" E & A required to give full effect to that acknowledgment. E & A argues that as the details of the Section 51 Transfer became clear, E & A concluded that no minor changes contemplated in the "*mutatis mutandis*" phrase were necessary. No unanticipated regulatory requirements were imposed on the parties.

■ Further, E & A argues that an addendum was unnecessary to handle the administrative issues raised by PCE, such as the need for reports, because contractual side agreements adequately addressed anticipated changes resulting from the transfer of liability from PCLA to E & A. Pursuant to a Run–Off Agreement, dated the same date as the other agreements, E & A and PCLA agreed that E & A's affiliate, Trinity Square Services Limited ("TSS"), would manage the run-off[8] of the Portfolio and would, in that connection, collect and apply all premiums and render reports to PCLA and E & A concerning the business. Pursuant to a Supplemental

---

6. In a reinsurance agreement, an insurer contracts with a third party to insure against loss or liability by reason of the original insurance. Thus, PCLA would remain liable on the policies to its policy holders, but would have insurance with another carrier to protect it from the risks assumed under these policies.

7. This Latin phrase simply means that the necessary changes in details, such as names and places, will be made but everything else will remain the same.

8. TSS was a United Kingdom company that provided administrative services for insurance companies liquidating claims but no longer writing new business, a condition known as "run-off."

Agreement, dated the same date, E & A, TSS and PCE agreed that PCE would receive the reports rendered by TSS.

## V. Analysis

The crux of the disagreement between the parties is what effect the failure to execute an addendum has on E & A's exposure. E & A argues that by not executing an addendum the balance of liabilities remained unchanged and simply confirms E & A's conclusion that no addendum was necessary to handle the effects of the Section 51 Transfer. PCE argues that by not executing an addendum, E & A assumed all of the liabilities it had previously reinsured.

■■■■■ A close reading of Article XII reveals that its terms are unambiguous.[9] This clause gives E & A the ability to compel CIL to enter into an addendum. By agreeing that "the parties hereto [E & A and CIL] shall enter into an addendum to this Agreement in such form as [E & A] shall reasonably require," the second occurrence of "shall" conditions the first occurrence of "shall" in this phrase. The result is to leave the determination of whether an addendum is necessary, as well as the ability to compel CIL to enter into an addendum, solely in the hands of E & A.

Further, Article XII explicitly states that the purpose of the addendum is "to give full effect to the above acknowledgment and agreement and any consequential alterations required to this Agreement by virtue of the transfer." If E & A did not believe additional provisions were necessary, no addendum would be required. English law is not to the contrary. *See* I *Chitty on Contracts*, ¶ 22–041 (27th ed.1994) ("[w]here the terms of a contract include a provision which has been inserted solely for the benefit of one party, [it] may, without the assent of the other party,

waive compliance with that provision and enforce the contract as if the provision had been omitted.").

In addition, this interpretation of Article XII results in a commercially sensible construction favored by English law. At the time these agreements were negotiated, the parties clearly contemplated there would be a Section 51 Transfer which would transfer PCLA's liability to E & A. The parties also clearly negotiated agreements that limited E & A's exposure. E & A agreed to accept this defined portion of the risk provided that Gaston and Dupee gave a guarantee, through PCE, of any residual liability in excess of the portion E & A agreed to accept. PCE's admissions substantiate E & A's description of the parties' intent in entering these agreements.

Further, the side agreements negotiated by the parties provide for the administrative requirements raised as an issue by PCE, including reports. The Supplemental Agreement entered into by E & A, TSS and PCE provided the mechanism through which PCE would receive reports rendered by TSS. Although PCE contends that reliance on the side agreements ignores the fact that CIL was not a party to either the Run–Off Agreement or the Supplemental Agreement (and CIL's sole right to receive reports came from the Retrocessional Agreement), PCE's reliance on the interests of CIL cannot be considered conclusive since—at the time these agreements were negotiated and signed—both parties admit that PCE, not CIL, was the real party providing security for the risk assumed by E & A, regardless of subsequent developments.[10] *See* Pls' 56.1 Stmt. at ¶¶ 12–13; Def's Reply Memo. at 4.

## VI. Conclusion

■■■■■ Because the meaning of Article XII is unambiguous, Defendant's summary

---

9. Because the text of Article XII is not ambiguous, resort to the *contra proferentem* rule is inapplicable. I *Chitty on Contracts*, ¶ 12–071 (27th ed.1994).

10. By the time of the Section 51 Transfer, CIL was no longer an affiliate of PCE, through which it may have received reports from TSS under intra-group arrangements.

judgment motion is denied. The remaining question is whether to enter summary judgment in favor of the non-movants on this claim. It is well established that a court may grant summary judgment to the non-moving party despite the absence of a cross-motion by that party. *See Celotex*, 477 U.S. at 326, 106 S.Ct. 2548. The court may do so sua sponte without prior notice when the evidence before the court is fully developed, so that the moving party suffers no procedural prejudice. *See, e.g., Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir.1998) (*citing Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991)). In evaluating the adequacy of the record for this purpose, the court should consider whether the moving party had a sufficient reason to present all of the evidence in its favor. *See, e.g., Coach Leatherware*, 933 F.2d at 167. If the court is satisfied that all of the relevant evidence has been proffered and its determination of the merits is based solely on its assessment of the issues raised by the moving party, then the threat of procedural prejudice is minimal. *Id.*

■ In this motion, Defendant relied solely on the absence of the addendum to support its position that it had no liability on the guarantee it signed. That defense has failed and partial summary judgment is granted to Plaintiffs on that issue. Defendant may have other defenses to payment which were not addressed in this motion. A conference is scheduled for December 4, 1998 at 3:00 p.m. At that time the parties should explain what issues, if any, remain to be tried.

EXHIBIT A

