In re Petition of Anthony James McMA-
HON and Roger Smith, as Joint Provi-
sional Liquidators of English &
American Insurance Company Limit-
ed, Debtor in Foreign Proceedings.

Anthony James McMahon and Roger
Smith, as Scheme Administrators of
English & American Insurance Com-
pany Limited, Plaintiffs,

v.

Providence Capitol Enterprises,
Inc., Defendant.

No. 97 CIV. 8356 SAS.

United States District Court,
S.D. New York.

June 3, 1999.

See also 235 B.R. 527.

Gregory M. Petrick, Mary Elizabeth Taylor, Simon C. Roosevelt, Cadwalader, Wickersham & Taft, New York City, for Plaintiffs.

David L. Katsky, Adrienne B. Koch, Judith M. Shampanier, Esanu Katsky Korins & Siger, LLP, New York City, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

This case involves a complicated set of transactions among many inter-related companies. All of the documents at issue are governed by British law. The heart of the dispute concerns whether Defendant Providence Capitol Enterprises, Inc. ("PCE") is discharged from liability under a Guarantee entered into in 1986.

### I. Facts

#### A. 1986 Transactions

English & American Insurance Company Limited ("E & A") was a United Kingdom insurance company that specialized in reinsuring risk in the London market for United States— and Japan-based companies.[1] In 1983, Paul Dupee ("Dupee") and Don Gaston ("Gaston") arranged a management buy-out of E & A. *See* Plaintiff's Rule 56.1 Statement ("Pls' 56.1 Stmt.") at ¶ 7; Defendants' Rule 56.1 Statement ("Defs' 56.1 Stmt.") at ¶ 7. Dupee and Gaston and the other participants in the buy-out formed a holding company, London & Gloucester ("L & G"), which became the parent company of E & A. *See* Joint Pretrial Order ("JPTO"), Plaintiffs' Contentions ¶ 6(b). Gaston[2] and Dupee thereafter owned 50% of L & G through a company named BD Partners and, in turn, 50% of E & A. *See* Pls' 56.1 Stmt. at ¶ 7; Defs' 56.1 Stmt. at ¶ 7.

PCE is a Delaware corporation that at one time did business in Colorado and New York. It serves principally as an investment holding company. *See* Pls' 56.1 Stmt. at ¶ 1.[3] From 1983 through 1987, PCE was primarily owned, directly and indirectly, by Dupee and Gaston. *Id.* at ¶ 2; Defs' 56.1 Stmt. at ¶ 2. Until 1987, a company named Providence Capitol Insurance (Channel Islands) Limited ("CIL") was an affiliate of PCE. In addition to PCE and CIL, other members of the Prov-

---

1. The High Court of Justice of England and Wales in London, England sanctioned a Scheme of Arrangement for E & A on January 25, 1995. Pursuant to this Arrangement, Plaintiffs, as Scheme Administrators, administer the assets of E & A for the benefit of the estate's policyholders and other creditors.

2. References to the interests of Gaston are intended to include interests held by his family.

3. PCE contests the characterization of PCE as an "investment holding company" on the ground that such phrase represents a legal conclusion. Dupee, however, testified that PCE was "an investment holding company of sorts" and that "[i]t never conducted active business, other than holding investments." Deposition of Paul Dupee ("Dupee Tr.") at 20.

idence Capitol group of companies included Providence Capitol Limited ("PCL") and Providence Capitol Life Assurance Company Limited ("PCLA"). *See* Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pls' Mem.") at 4. In 1996, Dupee bought out Gaston's interest in PCE, and Dupee now owns 100% of PCE.

On or about January 27, 1986, the parties entered into a series of agreements. First, E & A entered into an agreement (the "Reinsurance Agreement") with PCLA pursuant to which E & A agreed to reinsure PCLA for a particular book of business (the "Portfolio") in exchange for a premium of £6.5 million. This agreement obligated E & A to accept 100% of the insurance liability for the Portfolio.

Concurrently, E & A entered into an agreement (the "Retrocessional Agreement") with CIL, in which CIL agreed to assume many of the rights and obligations of E & A concerning the Reinsurance Agreement. By entering into the Retrocessional Agreement, E & A effectively limited its exposure, transferring liability to CIL in excess of the £6.5 million premium plus investment income on that amount. *See* Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Defs' Mem") at 4.

Also on the same day, E & A, PCE and PCL executed a third agreement, a guarantee (the "Guarantee") obligating PCL, an affiliate of CIL, to ensure that CIL performed its obligations under the Retrocessional Agreement and to indemnify E & A against all losses, damages, costs and expenses incurred by E & A should CIL fail in its obligations. The Guarantee provides that "[PCL] will procure that [CIL] shall at all times promptly and fully observe and perform all the obligations on the part of [CIL] contained in the [Retrocessional Agreement]." Further,

> [u]pon the occurrence of either of the following events, that is to say:—(i) the presentation of a petition or an order being made or an effective resolution

being passed for winding up [PCL]; or (ii) the giving of notice to the holder by [PCL] or PCE to the effect that PCE shall assume the rights and obligations of the Guarantor under this Guarantee [-] thereupon and without further notice PCE shall be bound by the terms of this Guarantee as if PCE were the issuer thereof...

*See* Guarantee at § 3. PCL was liquidated on December 17, 1986.

**B. Management of Run-off and Reporting**

Under the Reinsurance Agreement, PCLA was obligated to furnish to E & A on a quarterly basis a report concerning premiums, losses and estimates of future losses. *See* Reinsurance Agreement at Article V(B). The Retrocessional Agreement provided that "[E & A] shall permit all accounts and reports to be furnished directly to [CIL] by [PCLA] at the same time that such accounts and reports are furnished to [E & A]." *See* Retrocessional Agreement at Article VII.

Also on January 27, 1986, another company owned by L & G, Trinity Square Services Limited ("TSS") was retained to provide management services to E & A and PCLA pursuant to a "Run–Off Agreement." Under the Run–Off Agreement, TSS managed and administered the run-off of claims, rights and obligations under insurance and reinsurance policies. Also on this day, TSS, E & A and PLCA entered into a "Supplemental Agreement" pursuant to which PCE assumed some of the obligations of E & A under the Run–Off Agreement and also became entitled to certain of its benefits.

The Run–Off Agreement provides that TSS "shall ... use its best endeavours to furnish to [PCLA] and E & A reports and accounts relating to the run-off business." *See* Run–Off Agreement at ¶ 3(2). The Supplemental Agreement states that TSS will use its best endeavours to furnish to PCE the reports[,] accounts and state-

ments mentioned in [¶ 3(2) of the Run–Off Agreement]. *See* Supplemental Agreement at ¶ 4.

### C. 1987 Transactions

In 1987, the parties entered into another series of transactions (the "1987 Transactions"), the purpose of which was to reduce BD Partners' shareholdings in L & G from 50% to a lower level and to allow L & G's stock to be more widely held. *See* Pls' 56.1 Stmt. at ¶ 18; Defs' 56.1 Stmt. at ¶ 14. The effect of the 1987 Transactions on the Guarantee forms the heart of the current dispute: do the 1987 Transactions release PCE from liability under the Guarantee?

On February 2, 1987, PCE transferred assets valued at Ł5.4 million to CIL. *See* Agreement Relating to the Transfer of Ł2 million of Debentures and 13.6% of Share Capital of London and Gloucester Limited ("Asset Transfer Agreement"). This Ł5.4 million was comprised of Ł2 million of L & G debt and Ł3.4 million in shares of L & G stock. *See* Pls' 56.1 Stmt. at ¶ 20.

On February 3, 1987, PCE transferred CIL itself to certain individuals who were directors of E & A. *See* Agreement Relating to the Sale of the Whole of the Share Capital of Capitol Insurance Limited. These directors, in turn, subsequently transferred CIL to L & G. *See* Pls' 56.1 Stmt. at ¶ 15–16; Defs' 56.1 Stmt. at ¶ 19.

Also on February 3, 1987, CIL, PCE, BD Partners and Gaston entered into an agreement known as the CIL Release and Indemnity (the "CIL Indemnity"), under which CIL agreed to indemnify or reimburse PCE for any claim it paid under the 1986 Guarantee to E & A. *See* JPTO, Stipulated Facts ("SF") at ¶ m. The relevant provision of the CIL Indemnity reads as follows:

2.2 CIL hereby agrees to indemnify and keep indemnified the Beneficiaries [PCE, BD Partners and Gaston]

[¶]2.2.1 in respect of all liabilities in relation to [the Guarantee] and made between [PCL] (which company has been completely liquidated), [E & A] and PCE in respect of a Retrocessional Re–Insurance Agreement dated 27th January 1986 made between E & A and CIL . . .

Also on February 3, 1987, L & G, PCE, BD Partners and Gaston entered into an agreement called the L & G Indemnity Agreement ("L & G Indemnity," and together with the CIL Indemnity the "1987 Indemnities"). This agreement contains a provision virtually identical to the one quoted above, except that in place of CIL, L & G agreed to indemnify PCE in respect of all liabilities in relation to the Guarantee.

Thus, read literally, the Guarantee and the 1987 Indemnities created a situation of cross indemnity. Under the Guarantee, PCE guaranteed CIL's performance under the Retrocessional Agreement; under the 1987 Indemnities, CIL and L & G agreed to indemnify PCE in the event it incurred any liability with respect to the Guarantee.

The parties do not dispute that under the 1987 Indemnities, CIL and L & G agreed to reimburse PCE for any claim it paid under the Guarantee. *See* SF at ¶ m. The parties also do not dispute that there is no document releasing PCE from the Guarantee. *See* Defendants' Pretrial Memorandum ("DPM") at 5; Plaintiffs' Pretrial Memorandum ("PPM") at 5. They agree that the parties decided not to enter into a "release" agreement for a variety of reasons, including the fact that entering into a release would have required E & A (or its parent) to pay capital gains taxes on the value of the liabilities being released. *See* DPM at 5; PPM at 5.

The parties do, however, dispute the effect of the 1987 Transactions taken as a whole. According to PCE, the parties intended through these transactions to release PCE entirely from the Guarantee. E & A disputes this assertion, and argues that PCE received indemnities from L & G and CIL, and consequently assumed the risk that these companies would remain

solvent and able to meet their indemnification requirements.

### D. Post–1987 Transactions

#### 1. Section 51 transfer

In early 1988, the British Secretary of State for Trade and Industry, acting pursuant to Section 51 of the Insurance Companies Act 1982, approved the transfer (the "Section 51 Transfer") of the Portfolio from PCLA to E & A. Thus, the Portfolio that was originally the subject of the reinsurance arrangement between E & A and PLCA became directly insured by E & A.

PCE, in its earlier motion for summary judgment, argued that because the parties had not entered into an addendum to the Retrocessional Agreement following this transfer, which would have provided for certain administrative matters (including giving CIL the right to receive reports directly from E & A), PCE was relieved from liability under the Guarantee. This Court held that the addendum was not required under the Retrocessional Agreement, and rejected that argument. *See In re McMahon*, 235 B.R. 527 (S.D.N.Y. Nov.30, 1998). It also found that the Supplemental and Run–Off Agreements provided the mechanism by which PCE was to receive reports relating to the Portfolio. *See id.* at 537–539.

#### 2. Other post–1987 events

PCE first asserts that after the 1987 Transactions it ceased receiving the reports it was entitled to receive under the Supplemental Agreement. PCE also notes that CIL eventually sold to a third party the shares of L & G that the Providence Capitol Group had contributed to CIL as part of the 1987 Transactions. The profit received from the sale of these shares, which represented most of CIL's assets (apart from the Ł2 million of L & G debentures) were then loaned interest-free to L & G. According to PCE, these interest-free loans stripped CIL of its ability to meet its liabilities under the Retrocessional Agreement.

PCE argues that these loans to L & G were made by CIL in lieu of reserving for liabilities under the Retrocessional Agreement because in the view of all of the E & A group companies, any such liability would be limited as a practical matter to whatever could be collected on the Ł2 million of L & G debt. It contends that as a group policy, reserves for the Portfolio were maintained and increased within E & A, not within CIL.

#### 3. Recent events

By order dated December 8, 1994, upon the Scheme Administrator's petition, CIL was placed in an insolvency proceeding. *See* Pls' 56.1 Stmt. at ¶ 26. By order dated May 10, 1993, L & G was placed in an insolvency. *Id.* at ¶ 27. Plaintiffs bring this action seeking a declaration that the PCE Guarantee remains in effect. If it does, PCE will be required to cover CIL's liabilities under the Retrocessional Agreement without receiving indemnity from CIL or L & G because both are now insolvent.

### II. Analysis

PCE presents a variety of arguments why it is not obligated under the Guarantee: (1) the 1987 Transactions, including the 1987 Indemnities, must be analyzed in light of their "commercial purpose," which was to release PCE from the Guarantee; (2) E & A cannot enforce the Guarantee because it has not complied with its obligations under the 1986 Agreements; (3) E & A is estopped from enforcing the Guarantee; and (4) E & A's actions operated as a release of the Guarantee.

#### A. 1987 Contracts

PCE argues that even if there was no release agreement, the purpose of the 1987 Transactions was to release PCE from its obligations under the Guarantee. According to PCE, the parties contemplated that the commercial purpose of the 1987 In-

demnities was to effect a buy-out of the Guarantee, eliminating PCE's liability. Thus, it argues, the Ł2 million transferred from PCE to CIL represented the agreed-upon present value of PCE's estimated future liabilities under the Guarantee, which PCE paid as consideration for terminating that liability.

According to PCE, this result was beneficial to both parties. In 1987, L & G was seeking to broaden its shareholder base, and replacing the Guarantee with other assets made L & G's shares more attractive to investors. At the same time, the Providence Capitol group was voluntarily liquidating many of its companies, and it viewed the Guarantee as a liability that needed to be eliminated. As mentioned above, the parties decided, at E & A's request, not to enter into a release of the Guarantee in order to avoid capital gains tax for E & A. Instead, PCE contributed to CIL the Ł2 million previously agreed upon for a release, and the Providence Capitol Group contributed an additional Ł3.4 million worth of L & G stock, representing the value of other liabilities to be cancelled. PCE then sold CIL to certain principals of E & A who, in turn, transferred CIL to L & G for Ł1. At the same time, the parties also entered into the 1987 Indemnities. The result—and the express intent of all the parties, according to PCE—is that PCE would be relieved of liability under the Guarantee.

PCE argues that it is entitled to present this interpretation to a jury. It contends that under British law, the 1987 Agreements must be interpreted in light of the business purpose that the parties intended to achieve. Thus, it argues, it should be permitted to present evidence of the entire factual matrix surrounding these agreements, including the negotiations leading up to them—which reveal that all parties intended to release PCE from its liabilities under the Guarantee. It seeks to admit evidence of the calculation of the Ł2 million figure, which it contends was calculated to be the full value of a release; evidence that a formal release was not given in order to accommodate E & A's desire to avoid or defer tax; the way that E & A and PCE treated the Guarantee on their accounts and records following these transactions; and representations made by L & G to governmental authorities at the time of the agreements suggesting that it never believed that the L & G Indemnity would ever be enforced and so did not have to reserve for any liabilities under that agreement.

E & A argues that the terms of the Guarantee are clear and unambiguous, providing that PCE will guarantee CIL's performance under the Retrocessional Agreement if CIL became insolvent. According to E & A, there is no agreement, written or oral, that releases that Guarantee obligation. This fact, it contends, is expressly supported by the language of the CIL Indemnity and the L & G Indemnity, which each provide that CIL and L & G agree "to indemnify and keep indemnified [PCE and certain of its principals] . . . in respect of all liabilities in relation to [the 1986 Guarantee] and made . . . in respect of a Retrocessional Re–Insurance Agreement." Rather than release the Guarantee, these agreements expressly acknowledge the continuing existence of the Guarantee obligation; rather than a release, PCE was provided with indemnifications under the CIL Indemnity and the L & G Indemnity. Thus, E & A contends, PCE assumed the credit risk of CIL and L & G, which turned out to be a bad decision.

E & A argues that no examination of extrinsic evidence is appropriate, because there is no ambiguity in these agreements. It further contends that even if the jury were to consider the factual circumstances, it cannot ignore the clear language of the agreements.

### 1. British law principles

◼ The controlling principles of English law, which were set forth in the previous opinion in this case, are worth

repeating and elaborating upon. Under English law, the words of a contract are interpreted according to their plain and ordinary meaning. *See Investors Compensation Scheme Ltd. v. West Bromwich Bldg. Soc'y* [1998] 1 W.L.R. 896, 904C ("it is, after all, from the words used that one must ascertain what the parties meant"); *Eastern Counties Building Society v. Russell,* [1947] 1 ALL ER 500, 503 ("[t]he whole instrument, as it stands, must be construed so as to give effect to the intention of the parties discovered from the actual terms agreed by the parties and employed by them in the written instrument as expressing what they intend to agree").

▮▮▮▮ The leading English treatise on contracts, Chitty on Contracts, states that:

The cardinal presumption is that the parties have intended what they have in fact said, so that their words must be construed as they stand. That is to say, the meaning of the document or of a particular part of it is to be sought *in the document itself:* "One must consider the meaning of the words used, not what one may guess to be the intention of the parties." However, no contract is made in a vacuum. In construing the document, the court may resolve an ambiguity by looking at its commercial purpose and the factual background against which it was made.

I *Chitty on Contracts,* ¶ 12–040 (27th ed.1994) (citations omitted)(emphasis in original).

### 2. Evidence admissible in aid of construction

▮▮▮▮ British law recognizes the parol evidence rule: "If there be a contract which has been reduced to writing, verbal evidence is not allowed to be given . . . so as to add to or subtract from, or in any manner to vary or qualify the written contract." *Chitty on Contracts,* ¶ 12–081. Thus, pursuant to this rule preliminary agreements and drafts and evidence of the negotiations between the parties are not admissible. *See Investors Compensation Scheme* [1998] 1 W.L.R. at 913; *Prenn v. Simmonds* [1971] 1 W.L.R. 1381, 1384–85. Nor is evidence admissible as to "the parties' subjective intentions with respect to the words used." *Chitty on Contracts,* ¶ 12–105; *Investors Compensation Scheme* [1998] 1 W.L.R. at 913; *Reardon Smith Line Ltd. v. Yngvar Hansen Tangen* [1976] 1 W.L.R. 989, 996 (per Lord Wilberforce)("the parties cannot themselves give direct evidence of what their intention was—and what must be ascertained is what is to be taken as the intention which reasonable people would have had if placed in the situation of the parties. Similarly when one is speaking of aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have in mind in the situation of the parties"). "Where the words of a written agreement have a clear and fixed meaning, not susceptible of explanation, extrinsic evidence is not admissible to show that the parties meant something different from what they have written." *Chitty on Contracts,* ¶ 12–104.

▮▮▮▮ Courts look not just to the language itself, but also to extrinsic evidence of the business purpose the parties sought to achieve and the factual background known to the parties at the time of contracting in order to determine if any ambiguity arises in applying the words to the particular circumstances at issue.

The general rule I take to be, that where the words of any written instrument are free from ambiguity in themselves, and where external circumstances do not create any doubt or difficulty as to the proper application of those words to claimants under the instrument, or the subject-matter to which the instrument relates, such instrument is always to be construed according to the strict, plain, common meaning of the words themselves; and that in such case evidence *dehors* the instrument, for the purpose of explaining it according to

the surmised or alleged intention of the parties to the instrument, is utterly inadmissible.... [I]t has always been considered ... as a corollary to, the general rule described above stated, that where any doubt arises upon the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and ascertained by evidence *dehors* the instrument itself; for both reason and common sense agree that by no other means can the language of the instrument be made to speak the real mind of the party.

*Id.* at ¶ 12–103 (citation omitted). In other words,

where the wording or phraseology is susceptible of more than one meaning, or if an ambiguity emerges when it is sought to apply the language of the document to the circumstances under consideration, extrinsic evidence will be admissible to ascertain the true meaning of the words or phrases used. The court is entitled (and, indeed, bound) to enquire beyond the language of the document and see what the circumstances were with reference to which words were used, and the object appearing from those circumstances which the person using them had in view. The court must place itself in the same "factual matrix" as that in which the parties were.

*Id.* at ¶ 12–104.

▮ Thus, in interpreting the contract, the court must always consider the objective facts and circumstances known to the parties at the time of the transaction—known as the "factual matrix"—and construe the contract consistently with its commercial purpose in order to arrive at a commercially sensible construction.[4] *See Investors Compensation Scheme* [1998] 1 W.L.R. at 912 ("[i]nterpretation is the as-

certainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract"); *Reardon* [1976] 1 W.L.R. at 995–96 ("[i]n a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating").

### 3. Analysis

A plain language reading of all of the contracts the parties entered into in 1987—which are all part of the factual matrix of the transaction—reveals that the written agreements did not release the Guarantee. The Asset Transfer Agreement (2/2/87) provides that PCE shall transfer to CIL certain L & G debentures valued at Ł2 million as well as L & G shares valued at Ł3.4 million. *See* Asset Transfer Agreement at §§ 2.1, 2.2. The agreement further provides that the consideration for such transfer "shall be satisfied by the issue of notes ('the Notes') in the sums of Ł2,000,000 and Ł3,400,000 respectively both in the agreed form each being secured by a charge over the L & G Debentures and the L & G Shares in favour of PCE and [BD Partners] respectively in the agreed form[.]" *Id.* at § 2.3. Under the heading "Repayment Option," the agreement specifies that "PCE and [BD Partners] may at their option in lieu of payment of the amounts due under the Notes [sic] a release and indemnity in the agreed form from CIL and against delivery of such release and indemnity the Notes and the said charges shall be cancelled and returned to CIL[.]" *Id.* at § 3.

On the following day (2/3/87), the parties entered into such a release and indemnity

---

4. In England, contract disputes are tried to the court. In deciding this motion, I shall look to the "factual matrix" as PCE has pre-

sented it. If this examination raises any questions of fact, the interpretation of the contract will be for the jury to decide.

with CIL. The CIL Indemnity provides that in consideration of the "surrender and cancellation of the Notes and the charges" as well as the sum of Ł1, CIL agrees to do two things. First, it agrees that "all liability of any party under and in respect of the agreement referred to in Schedule I hereto is released and cancelled." Schedule I lists only an agreement named the "Permanent Surplus Reinsurance Agreement No. G/I/78." Neither party argues that such agreement in any way affects PCE's obligations under the Guarantee. Second, CIL agrees "to indemnify and keep indemnified [PCE, BD Partners and Gaston] ... in respect of all liability in relation to a guarantee dated 27th January 1986 and made between [PCL, E & A and PCE] in respect of a Retrocessional Re-Insurance Agreement dated 27th January 1986 made between E & A and CIL." CIL also agreed to indemnify PCE with respect to certain other agreements and another guarantee.

Thus, in contrast to the Permanent Surplus Reinsurance Agreement—which is explicitly released and cancelled—the language of the CIL Indemnity (and the L & G Indemnity, which contains the identical indemnification language) contemplates that liability under the Guarantee is to remain in place and CIL and L & G are to provide indemnification for such liabilities.

 Examining the "factual matrix" and commercial circumstances surrounding these agreements does not give rise to any ambiguity in the interpretation of the plain meaning of the agreements. PCE admits that the parties contemplated entering into a release of the Guarantee, but that option was rejected due to the unfavorable tax consequences it would cause E & A (or its parent L & G) to suffer. *See* Defs' Mem. at 8. PCE contends that the commercial purpose of the

transactions was to "buy-out" the Guarantee because the parties believed that replacing the Guarantee with other assets would make L & G's shares more attractive to investors. This belief, according to PCE, was based on E & A's desire not to be dependent on PCE, which might one day be placed in liquidation. Even if these aims are accepted as the motivation for the 1987 Transactions, however, and even if all of PCE's factual contentions are accepted as true, they also do not suggest any ambiguity.[5] There is no dispute that the parties intentionally structured their transaction as indemnities: the documents provide that CIL and L & G would indemnify PCE for liabilities under the Guarantee. As long as L & G and CIL were solvent, PCE would never be called to pay under the Guarantee and was thus effectively released. Once L & G and CIL became insolvent, however, the indemnities no longer protected PCE.

 British law requires an examination of the "factual matrix" and commercial purpose of a contract. But the factual matrix cannot supplant the written words of an agreement; rather, the facts and circumstances inform the interpretation of those words. *See* Report of Defendants' expert Terence Mowschenson ("Mowschenson Rep.") submitted in conjunction with Defs' Mem. at ¶ 10 ("the appropriate way to determine the meaning of an agreement is to *examine the language used* by the parties in light of the business purpose they sought to achieve") (emphasis added); *Haryanto v. ED & F Man* [1986] 2 Lloyd's Rep. 44 (at Pl.App.[6] 23)("unless some question of waiver or estoppel arises the contemplation or expectation or intention (unless incorporated in the contract) of the parties or either of them as to the way in which it will be performed or left unperformed does not affect their legal rights or

---

5. E & A contends that almost all of the evidence PCE seeks to introduce is inadmissible parol evidence. PCE asserts that it is not parol evidence because it is part of the "factual matrix." The line between parol evidence

and the "factual matrix" is not easily discernible.

6. References to "Pl.App." are to Plaintiffs' Appendix of British Authorities.

obligations under it"). PCE is asking the trier of fact to do more than look at the factual matrix and business purpose to interpret the contract. It is asking the trier of fact to rewrite the contract and restructure the transactions.

I therefore conclude that the contracts are clear and unambiguous. The trier of fact will not be permitted to consider extrinsic evidence as an aid to contract interpretation. Rather, the trier of fact will be permitted to review the contracts in the context of the defenses raised by PCE.

### B. Breaches by E & A of 1987 Agreements

 Under British law, a creditor cannot enforce a guarantee if it has departed from the guarantee without the guarantor's consent, as long as such departure is "not obviously and without inquiry quite unsubstantial." Halsbury's Laws of England Vol. 20, 4th ed. Reissue ¶ 332. Similarly, if the underlying agreement giving rise to the obligations guaranteed is embodied or incorporated in the terms of the guarantee, a departure from the terms of the underlying agreement that is not insubstantial will also prevent the creditor from enforcing the guarantee. *See id.; Wardens and Commonalty of the Mystery of Mercers of the City of London v. New Hampshire Ins. Co.,* Slip. Op. (Queen's Bench Division, Commercial Court, January 18, 1991)(at Def.App. 17)[7] (where underlying contract is incorporated in guarantee "any variation of the underlying contract which is not manifestly insubstantial or incapable of prejudicing the [guarantor] will discharge the [guarantor] from [its] obligations under the contract of guarantee").

According to PCE, E & A engaged in multiple breaches of both the Retrocessional Agreement and the Supplemental Agreement. PCE contends that because these agreements are expressly incorporated in the Guarantee, any breach should release PCE from the Guarantee, unless a jury determines that the breaches are insubstantial.

### 1. Breaches of the Retrocessional Agreement

PCE claims that E & A failed to comply with four requirements of the Retrocessional Agreement. First, it alleges that E & A failed to confer with CIL concerning investment of the funds that formed the reserves for the Portfolio. Second, it alleges that E & A failed to confer annually with CIL concerning the adequacy of the reserves. Third, PCE contends that E & A failed to maintain sufficient accounting separation to enable "it"[8] to identify investment income attributable to the reserves. Fourth, PCE argues that E & A failed to cause certain reports to be forwarded to CIL.

 E & A first disputes PCE's assertion that the obligations owed under the Retrocessional Agreement are incorporated into the Guarantee. This argument is unpersuasive. The Guarantee expressly states that it is "supplemental" to the Retrocessional Agreement. It further provides that PCE agrees to enter into the Guarantee in "consideration" of E & A entering into the Retrocessional Agreement and accepting CIL as the retrocessionaire. There is no dispute that the original purpose of the Guarantee was for PCL/PCE to guarantee CIL's obligations under the Retrocessional Agreement. The intent to incorporate the Retrocessional Agreement into the Guarantee is clear from the face of the Guarantee. *See Wardens and Commonalty,* (at Def.App. 17) ("[i]n many cases the obligations [guaranteed] will be those arising under a specific contract between debtor and creditor. This may be evident from the terms of the

---

**7.** References to "Def.App." are to Defendants' Compendium of British Authorities.

**8.** PCE's argument is unclear in that "it" could mean PCE or E & A. Either way, PCE considers E & A's failure to maintain separate accounts to be a material breach.

contract of guarantee itself, where specific reference is made to the contract giving rise to the obligations guaranteed ... In such circumstances the terms of the contract giving rise to the obligations guaranteed will be treated as embodied or incorporated in the contract of guarantee").

E & A also contends that the Guarantee specifically contemplates that CIL and E & A could alter the terms without releasing PCE. The Guarantee provides that:

> The Guarantor shall not be discharged or released from its obligations hereunder by any arrangement made between [E & A] and [CIL] without the assent of [PCE] or by any forebearance given by [E & A] to [CIL] whether as to payment[,] time[,] performance or otherwise howsoever[.]

*See* Guarantee at § 2. PCE counters that E & A and CIL did not enter into any "arrangement" or agree to any "forebearance," but, rather, that E & A breached the Retrocessional Agreement, which released the Guarantee.

■ This clause does not foreclose PCE's defense. The language quoted above allows E & A and CIL, for example, to enter into an "arrangement" to alter the obligations running between them, or permits E & A to "forebear" a payment (or other obligation) owed to E & A. Such an interpretation comports with logic and results in a commercially sensible construction. Presumably, by entering into an "arrangement" with E & A or receiving the benefit of "forebearance" by E & A, CIL has agreed to the alteration. Because PCE's interests are aligned with CIL's interests, as PCE is guaranteeing CIL's obligations, PCE could expect that it would not be prejudiced by any such "arrangement" or "forebearance," even though they could be undertaken without PCE's consent.

On a plain reading of the language, however, the clause does not allow E & A to unilaterally breach an obligation it had under the Retrocessional Agreement. Such an interpretation is counterintuitive and commercially unreasonable, as PCE would have no protection against E & A's unauthorized actions. This clause cannot be read to eliminate a defense based on breach of contract.

### a. Failure to confer concerning investment and reserves

■ Whether E & A breached the Retrocessional Agreement by failing to confer with CIL concerning investment of the Portfolio funds and concerning adequacy of the reserves, and whether such breaches were substantial, are fact questions for the jury. The relevant provisions of the Retrocessional Agreement follow:

> [E & A] shall invest the premiums payable by [PCLA] to [E & A] under Article III of [the Reinsurance Agreement] in such stocks, securities or other investments as [E & A] shall nominate and as [CIL] shall agree (such agreement not to be unreasonably withheld) being approved investments for an insurance company in the United Kingdom[.]

> The investment income from time to time arising from such investments shall be added to the said premiums to form the claims reserves in respect of the [Reinsurance Agreement.]

> On or within 90 days after the expiration of each calendar year the parties hereto shall confer with a view to establishing what adjustments are appropriate in respect of the said claims reserves. Any amounts from time to time agreed by the parties hereto ... to be in excess of the reserve requirements shall be paid as to one half to [CIL] ... and as to the other half shall be released to [E & A's] profit and loss account[.]

> If at any time [E & A] shall be satisfied that the said reserves are inadequate and that [CIL] will thereby become liable to make payments under this Agreement it shall be entitled to require that the said reserves shall be increased by such amount as it deems fit and that [CIL] shall forthwith pay to [E & A] its

due proportion of the increase so required (such payment satisfying pro tanto the liability of [CIL] under this Agreement)[.]

*See* Retrocessional Agreement at Article V.

E & A argues that this provision is not mandatory, because it provides that E & A shall confer and shall be entitled to require additional reserves if it deems it necessary. E & A is correct that the Retrocessional Agreement placed the determination of whether or not to require an increase in reserves within the discretion of E & A. The agreement, however, states in mandatory language that E & A had the obligation to confer once a year with CIL in order to establish whether any such adjustments were appropriate. Thus, although failure to increase the reserves may not result in a breach, failure to confer in order to determine whether any adjustment in reserves was appropriate may be. In addition, the agreement also states in mandatory terms that E & A shall invest the premiums in such investments as E & A and CIL agree upon. Thus, PCE can present to the jury its theory that E & A breached these obligations and that such breaches were substantial.

#### b. Failure to maintain separate accounts

 As to the third alleged breach, the Retrocessional Agreement does not contain any provision requiring E & A to maintain a separation of accounts. Thus, E & A's failure to do so could not have been a breach of the agreement.

#### c. Failure to provide reports to CIL

The fourth breach alleged by PCE is E & A's failure to provide reports to CIL. The agreements provide for the following reporting requirements. The Reinsurance Agreement provides that "PCLA shall through [TSS] furnish to [E & A] within 60 days after the end of each calendar quar-

ter an account of the net premiums received and net losses paid" and "shall also through the Manager prepare a report of losses advised, but not yet, paid on a quarterly report." *See* Reinsurance Agreement at Article V(B). The Retrocessional Agreement provides that "[E & A] shall permit all accounts and reports to be furnished directly to [CIL] by [PCLA] at the same time that such accounts and reports are furnished to [E & A]." At the same time that the parties entered into the Retrocessional Agreement, they also entered into the Run–Off Agreement, which provides that TSS "shall use its best endeavours to furnish to [PCLA] and [E & A] reports and accounts relating to the run-off business." Under the Supplemental Agreement, TSS also agreed to use its best efforts to provide those reports to PCE.

PCE argues that E & A was obligated to provide reports to CIL based on its failure to enter into an addendum following the Section 51 Transfer. According to PCE, following the Section 51 Transfer, PCLA was no longer involved and E & A became the primary insurer, yet E & A failed to enter into an addendum to account for changes in reporting requirements. Thus, it argues, after the transfer one of three things must have happened: (1) E & A assumed the obligation to report directly to CIL; (2) the Supplemental Agreement's requirement that reports be rendered directly to PCE became part of E & A's obligations under the Retrocessional Agreement; or (3) the Retrocessional Agreement lapsed. Because this Court rejected the third option, PCE argues, one of the other two options must have occurred.

PCE's argument makes sense. Prior to the Section 51 Transfer, PCLA, the primary insurer, had an affirmative obligation to provide, "through TSS," quarterly reports to E & A, the reinsurer. The Retrocessional Agreement acknowledged that the Portfolio "may ultimately be transferred" pursuant to Section 51, and it pro-

vided that E & A and CIL could enter into an addendum to provide for any "consequential alterations" that would be required by virtue of the transfer. The parties did not enter into such an addendum. This Court previously held that under a plain reading of the Retrocessional Agreement, E & A could waive compliance with this requirement if it believed such an addendum to be unnecessary.

E & A now argues that even though the Retrocessional Agreement remained in force, the only reporting obligation left in place after the Section 51 Transfer was TSS's obligation to report to E & A, PCLA and PCE. Under this arrangement, however, CIL, the reinsurer of E & A's obligations, would not be entitled to receive reports of the liabilities and premiums related to the Portfolio that it was responsible for reinsuring. This is commercially unreasonable. The only reasonable consequence of the Section 51 Transfer and E & A's failure to enter into an addendum is that after the transfer, E & A assumed the responsibility, previously held by PCLA, to provide reports to the reinsurer. Before the transfer PCLA as the primary insurer had the obligation to provide reports to E & A, the reinsurer. After the transfer, E & A—the new primary insurer—took on the obligation to provide reports to CIL— the new first line of reinsurance.

 The problem is that none of the agreements providing for the generation and distribution of reports explicitly required E & A to deliver reports to CIL.

Nonetheless, if the trier of fact concludes that E & A implicitly assumed PCLA's reporting obligations by contemplating and consenting to PCLA's withdrawal from the risk and agreeing to assume that risk as a primary insurer, then its failure to provide reports to CIL may be a material breach of the Retrocessional Agreement.[9] Furthermore, as discussed *infra,* if E & A assumed TSS's reporting requirements and failed to deliver reports to PCE—a clear requirement under the Supplemental Agreement—this failure could constitute a breach that releases the Guarantee.

### 2. Breaches of Supplemental Agreement

#### a. Failure to provide reports to PCE

The second prong of PCE's reporting argument is that E & A can be held accountable for breaches of the Supplemental Agreement, which obligates TSS to send reports to PCE. According to PCE, because E & A did not enter into an addendum to the Retrocessional Agreement after the Section 51 Transfer, this reporting requirement should be read as part of E & A's obligations under the Retrocessional Agreement, and TSS' failure to provide reports to PCE was a breach of that agreement.[10] E & A, by contrast, argues that none of the 1986 agreements imposed any record-keeping or reporting requirements on E & A. Rather, the Supplemental and Run–Off

---

9. In an earlier motion, E & A conceded that as of 1986 it assumed that PCE was on the risk, not CIL. It implies that PCE also made this concession. However, a review of PCE's Reply Brief on that motion reveals that it conceded the proposition solely for the purposes of that motion because the point was immaterial to that motion. If the trier of fact concludes that, in fact, both E & A and PCE knew that PCE and not CIL was the "real party in interest," then E & A's failure to report to CIL would be insubstantial as a matter of law.

10. In its earlier summary judgment motion, PCE argued that the Retrocessional Agree-

ment must have lapsed after the Section 51 Transfer because E & A failed to enter into an addendum with CIL that would have clarified the parties' rights to receive reports concerning the Portfolio. E & A argued, and this Court accepted, that the addendum was unnecessary because the Supplemental Agreement provided the mechanism through which reports would be distributed, namely that TSS would provide reports to PCE. Contrary to PCE's contentions, this Court did not find that the responsibility given to TSS in the Supplemental Agreement was assumed by E & A. *See generally In re McMahon,* 235 B.R. 527 (S.D.N.Y.1998).

Agreements provided that TSS would report to E & A, PCLA and PCE directly.

 E & A's interpretation is correct. The parties entered into the Retrocessional Agreement, the Supplemental Agreement and the Guarantee at the same time. Given the structure of the 1987 Transactions, it is clear that the Supplemental Agreement and the Retrocessional Agreement were meant to be read together. *See Chitty on Contracts,* ¶ 12–057 ("[s]everal instruments made to effect one object may be construed as one instrument, and be read together, but so that each shall have its distinct effect in carrying out the main design"). Under the Supplemental Agreement, however, TSS had the responsibility to provide reports to PCE. The Section 51 Transfer—and E & A's failure to enter into an addendum prior to effecting the transfer—did not prejudice PCE's rights to receive reports regarding the Portfolio. Both prior and subsequent to the transfer, PCE had the right to receive reports—but the obligation to provide them came from TSS, not from E & A. Thus, although TSS may have breached the Supplemental Agreement by its failure to provide the reports, this breach cannot be attributable to E & A in the absence of evidence that E & A caused the breach or that TSS was acting as E & A's agent. No such evidence has been offered in opposition to plaintiffs' motion for summary judgment.

### b. Transfer of run-off management from TSS

PCE contends that there were certain other breaches of the Supplemental Agreement. It argues that the agreement provides that management of the run-off could not be transferred from TSS to any other entity without PCE's consent, and that after the 1987 Transactions, E & A began managing the run-off itself, without consulting PCE. It also contends that after E & A went into insolvency, plaintiffs transferred responsibility for the run-off to an entity called Participant Runoff, which was set up with the specific purpose of managing the run-off of E & A's business.

In support of PCE's argument that E & A assumed the management of the run-off, PCE offers testimony of Matthew Scales, financial director of the E & A group of companies, and Christopher Keeling, director of E & A and L & G and chairman of TSS. E & A disputes that this testimony provides any such evidence.

Keeling testified that he did not have any specific recollection of what arrangements were made for the run-off of the Portfolio after the Section 51 Transfer and that he did not think he had any personal involvement in it. *See* Deposition of Christopher Keeling ("Keeling Tr.") at 35–36. He testified, however, that he assumed that after the transfer, the run-off business "would not belong in [TSS] any longer ... because [TSS] business was to manage third party run-offs, not in-house run-offs." *Id.* at 34. He testified that to his knowledge, TSS did not manage any run-offs for E & A after the transfer but that "I would imagine that the unit that was handling it would have been one of those separate units" and that "[w]e had in the E & A what we called the E & A miscellaneous account. These were E & A business [sic] which were effectively discontinued lines. It was principally the old English & American's non-marine accounts. They were all handled separately from [TSS]." *Id.* at 35–37. When asked if TSS managed the Portfolio after the transfer, he answered "[i]t just did not belong there. It is a long time ago. I do not believe so" and stated that he believed that the Portfolio would have been managed within E & A in a miscellaneous account. *Id.* at 67. Keeling also testified that after the transfer, "in practice E & A would have to have managed it to comply with their obligations to the Department of Trade" and that the responsibility could have been transferred to TSS but "it [E & A?] would have had to physically sit down and say 'That is the intention. That is what we are going to do.'" *Id.* at 68.

When asked whether TSS was handling management of the Portfolio after the Section 51 Transfer, Scales testified "I cannot remember what [TSS] actually did because after the portfolio transfer this business would actually become part of English and American Insurance Company. [TSS] would have handled run-off administration for third party clients." Deposition of Matthew Scales ("Scales Tr.") at 39–40. Asked if TSS handled the administration of any accounts for E & A, Scales said he did not think so. *Id.*

 PCE has raised an issue of fact as to whether E & A took over management of the Portfolio after the Section 51 Transfer. If E & A did take over such management, then it effectively stepped into the shoes of TSS and took over its obligations. E & A's failure to provide reports and its subsequent assignment of the management of the run-off to Participant Runoff could thus be a breach of the agreements and therefore form the basis for a release of the Guarantee.[11]

## C. Estoppel Defense

PCE argues that E & A is estopped from denying that the 1987 Transactions released PCE from its obligations under the Guarantee. It asserts that its estoppel defense has four aspects: (1) in reliance on E & A's representations that the 1987 Transactions would put an end to PCE's liability under the Guarantee, PCE paid L2 million, the calculated value of a full release; (2) in reliance on E & A's failure to report regularly to PCE concerning the liabilities and assets in the Portfolio, PCE: (a) did not seek further confirmation that it had, in fact, been released from the Guarantee, after it failed to receive reports from E & A; (b) did not seek to monitor the Portfolio or object to any actions taken by E & A with respect to the investment of funds or settlement of claims; and (c) did not provide in its own accounts for any liability under the Guarantee; (3) in reliance on E & A's and CIL's shared understanding that CIL's liability would not exceed whatever was collectible on the L2 million of L & G debentures CIL held, CIL loaned virtually all of its assets, interest-free, for the use of E & A, as a result of which CIL was unable to meet any obligations under the Retrocessional Agreement; and (4) based on their understanding that the Guarantee was no longer in force, CIL and L & G did not list PCE as a creditor in their respective insolvencies and thus PCE did not seek to intervene in the insolvency proceedings of CIL and L & G to assert rights it may have had against those companies. PCE argues that any reliance by CIL to its detriment is a defense to PCE's liability because under English law, a guarantor is entitled to assert any defense that the primary obligor can assert.

### 1. Analysis

#### a. Estoppel principles

#### (1) Estoppel by convention

 PCE argues that its estoppel defense is based on the British doctrines of estoppel by representation, convention, silence or acquiescence. Although distinctions among these principles have developed in British law, the modern tendency of British courts is to merge them into the rubric of estoppel by convention. *See Amalgamated Investment & Property Co Ltd. v. Texas Commerce Int'l Bank Ltd.* [1982] QB 84, 122 (estoppel "has evolved during the last 150 years in a sequence of separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory es-

---

11. E & A contends that Gaston and Dupee were kept informed about E & A's status and received reports about the Portfolio after 1987. PCE contends that these reports did not provide the level of detail that PCE was entitled to receive. Whether PCE received the reports to which it was entitled is a question of fact. Moreover, E & A may assert as a defense to PCE's contention that it failed to receive reports that PCE waived its rights through its failure to timely object.

toppel ... All these can now be seen to merge into one general principle shorn of limitations").

> When the parties to a transaction proceed on the basis of an underlying assumption—either of fact or of law—whether due to misrepresentation or mistake makes no difference—on which they have conducted the dealings between them—neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands.

*Id.* at 122.

In *Amalgamated,* plaintiff negotiated with defendant bank for a loan to ANPP, a subsidiary of plaintiff. The loan was secured by a guarantee, in which plaintiff promised as consideration for the loan to pay all moneys due to "you." Defendant subsequently arranged for a loan to be given by its subsidiary Portsoken to ANPP. The parties did not amend the guarantee, so that the guarantee, if read literally, would not cover the above-mentioned loan, since it was issued by Portsoken and not by defendant.

The court looked to the facts surrounding these transactions, as well as the course of dealing between the parties after the loan was given, and determined that the parties had been acting under the mistaken assumption that the guarantee covered the loan from Portsoken to ANPP. The court found that through their conduct, which was based upon this shared common mistake as to the meaning of the guarantee, they had become bound to abide by that mistaken interpretation.

 To find an estoppel, however, both parties must share the mistaken assumption and both parties must have conducted themselves on the basis of such assumption. Estoppel "requires communications to pass across the line between the parties. It is not enough that each of two parties acts on an assumption not communicated to the other. Such communication may be effected by the conduct of one party, known to the other." *Chitty on Contracts,* ¶ 3–081. The assumption need not have been expressly agreed upon by the parties, "but may be inferred from conduct, or even from silence." *Republic of India v. India Steamship Co. Ltd.* [1996] 3 All E.R. 641, 650. The mistaken assumption may, but need not, be induced by one party. *Id.* at 650 (accepting proposition that estoppel by convention may arise where there is "(1) a mistaken assumption of fact, (2) induced by A in the mind of B and shared by him (3) in reliance upon which both parties have conducted their affairs").

 The effect of the estoppel is "to preclude a party from denying an agreed assumption of fact or the meaning of a document." *Chitty on Contracts,* ¶ 3–082. The doctrine is based on the principle that it would "be unconscionable for a party to be permitted to deny that which knowingly or unknowingly he has allowed or encouraged another to assume to his detriment." *Norwegian American Cruises A/S v. Paul Mundy Ltd* (Lexis Printout) (Queen's Bench Division June 4, 1987).

### (2) Waiver

 Waiver is based on the principle that "[i]f one party, by his conduct, leads another to believe that the strict legal right arising under the contract will not be insisted upon, intending that the other should act on that belief, and he does so act on it, then the first party will not afterwards be allowed to insist on the strict legal rights when it would be inequitable for him to do so." *Mount v. Baker Austin* [1998] P.N.L.R. 493 (at Pl.App. 10). The requirements of waiver are "a clear statement by one party, whether by words or conduct, that he will not insist on exercising his legal rights; some action by the party to whom the statement is made in reliance on it; and circumstances which make it inequitable for the first party to

rely on his rights." *Id.* The doctrine is related to promissory estoppel and British courts "use them interchangeably when discussing situations in which it is alleged that one party to a legal relationship has indicated that he will not enforce his strict legal rights against the other." *Chitty on Contracts,* ¶ 3–078. Unlike estoppel by convention, a party relying on waiver must show a "clear" or "unequivocal" representation or promise. *Id.* at ¶ 3–080.

■ Although it must be clear or unequivocal, the promise or representation need not be express, but may be implied or made by conduct. *See id.* at ¶ 3–068. "Mere inactivity," however, will not suffice. *See id.* at ¶ 3–069.

### b. Analysis

The gravaman of PCE's estoppel argument is that E & A acted in such a way in and after 1987 as to cause PCE to reasonably believe that if it entered into the 1987 Transactions and paid the full amount of a release, it would be released, and that PCE relied to its detriment on that belief. In support of this argument, PCE seeks to introduce a variety of evidence, including testimony that the parties understood that PCE was paying the full value of a release in the 1987 Transactions, evidence that PCE agreed to indemnities rather than a release in order to accommodate E & A's tax issues, correspondence from lawyers for the L & G group of companies indicating that their clients were content to release PCE from the Guarantee,[12] evidence that PCE did not receive reports after 1987, and evidence of interest-free loans given by CIL to L & G.

E & A argues that PCE cannot rely on estoppel by convention based upon any

"mistaken" assumption because the evidence shows unequivocally that the parties deliberately chose not to enter into a release but rather to structure the 1987 Transactions as cross-indemnities. Given these circumstances, it contends, PCE's estoppel argument is not one of estoppel by convention, but of waiver.

■ PCE has raised issues of fact as to its estoppel defense, whether framed as waiver or estoppel by convention. Stated as an issue of waiver, the question is: did E & A, through its words and conduct, clearly and unequivocally lead PCE to believe that the strict legal right to enforce the Guarantee would never be exercised. *See Haryanto v. ED & F Man* [1986] 2 Lloyd's Rep 44 (at Pl.App. 4–5) ("[e]xtrinsic evidence may ... be admitted to show a collateral agreement or warranty and it is sometimes said that these, too, must not contradict the express terms of the written contract. But it is sometimes possible to prove an overriding oral warranty or even a promise not to enforce the express term of the written agreement").

■ Framed as an issue of estoppel by convention, the issue is: did E & A and PCE operate under the mistake—a mistake E & A both induced and acquiesced in—that by entering into the 1987 Transactions and by agreeing to a payment of Ł2 million, which was made, PCE would be released. E & A claims that such a belief would have been unreasonable, but the questions of whether E & A induced this assumption, and whether it was reasonable for PCE to rely on this assumption under the circumstances, are questions of fact. "The modern formulation of the question to be asked where there is a

---

12. E & A asserts that certain actions and statements are inadmissible because they were undertaken by employees or agents of L & G, and not E & A, which are separate legal entities. PCE does not assert any argument based on a theory of "piercing the corporate veil." It contends, rather, that E & A's directors and executives were also directors and executives of L & G, E & A's parent. Thus, it

argues, these individuals (as well as their agents) were acting on behalf of both E & A and L & G. A question of fact is presented as to whether an individual was acting on behalf of L & G only, or on behalf of both companies, when he authored a particular document, made a particular statement or took a particular action.

question of estoppel by convention is that the court should ask whether in the particular circumstances it would be unconscionable for a party to be permitted to deny that which knowingly or unknowingly he has allowed or encouraged another to assume to his detriment." *Republic of India* [1996] 3 All E.R. at 651; *Amalgamated* [1982] QB at 103 ("[o]f all doctrines, equitable estoppel is surely one of the most flexible").

■■■ PCE has presented its equitable defense as having four distinct elements, each one of which could support a finding of estoppel. While each may be sufficient in itself, PCE's proof is not limited to any one action. *See Haryanto v. ED & F Man* [1986] 2 Lloyd's Rep 44 (examining dealings between parties prior and subsequent to entering into agreement). Thus, PCE can submit evidence surrounding the 1987 Transactions, as well as the course of dealings of the parties subsequent to the transactions in attempting to prove its defense.[13]

### D. Inequitable Conduct

PCE also argues that under British law, if E & A engaged in positive acts related to the subject matter of the Guarantee that would cause PCE to suffer detriment if the Guarantee were to be enforced, such acts operate as a release of the Guarantee. *See* Mowschenson Rep. at ¶ 18. In support of this proposition, PCE cites to *Black v. Ottoman Bank* [1862] 15 E.R. 472.

In *Black*, a case on appeal from a tribunal constituted in Constantinople, plaintiffs engaged an individual named Pisani to receive, account for and pay over to plaintiffs certain money to be received from the Ottoman Government. Appellant executed a bond guaranteeing that Pisani would not engage in any acts of dishonesty or misappropriation in discharging his obligations. Following the misappropriation by Pisani of money and securities, plaintiffs sued appellant to collect on the bond. In its defense, appellant alleged that plaintiffs were "guilty of negligence and want of due care in checking and properly examining the accounts of said Pisani." He argued that from the terms of the Bond and the nature of the transaction the court should find that plaintiffs had assumed an implied obligation to examine the accounts. Their failure to do so, he contended, released appellant from his obligation under the bond. The court ruled that:

mere passive inactivity of the person to whom the guarantee is given, his neglect to call the principal debtor to account in reasonable time, and to enforce payment against him, does not discharge the surety; ... there must be some positive act done by him to the prejudice of the surety, or such degree of negligence as ... to imply connivance and amount to fraud.

*Id.* at 483.

#### 1. The interest-free loans

PCE's defense of release due to inequitable conduct is based on two alleged acts by E & A. First, PCE argues that E & A caused the assets of CIL to be stripped. It contends that after the 1987 Transactions, E & A led CIL to believe that its liability under the Retrocessional Agreement would be limited to whatever could be collected on the £2 million of L & G debentures, and that in reliance on this fact, CIL sold most of its other assets and loaned them interest-free to L & G instead of using those funds to increase its reserves for liabilities. According to PCE, the loans were never repaid nor was a date

---

13. In proving the course of dealings between the parties, PCE may attempt to show that CIL relied to its detriment on E & A's representation, through words or conduct, that CIL should loan all of its assets in excess of £2 million to L & G because its liability under the Retrocessional Agreement was limited to

that amount. If the trier of fact believes this to be so, then PCE can argue that because E & A would be estopped from asserting a claim in excess of that amount against CIL, it is also estopped from asserting such a claim against PCE.

set for repayment. PCE contends that the reason for the loans was that as a matter of E & A group policy, all available funds were channeled to E & A, which needed to maintain a certain level of capital. It argues that the individuals who authorized the loans were the management of L & G and of E & A, and that these individuals were working for the benefit of E & A as E & A's agents.

E & A argues, however, that interest-free loans by CIL to L & G have no meaning because L & G always had the right to use available funds in the group companies. *See* Deposition of Philip Evans, Chairman of E & A and Chief Executive of L & G ("Evans Tr.") at 17–18, 221 (stating that he did not believe there were any restrictions on L & G's ability to obtain assets from CIL). Moreover, it contends, the inter-company loans were recorded on CIL's books, and there is no evidence that CIL and L & G did not intend for the loans to be repaid.

E & A also argues that there is no evidence that E & A initiated any transfer from CIL to L & G. It contends that the individuals who effected the loans could not have been acting as agents for E & A because only CIL's Board and L & G's Board could approve the loans and no member of E & A's Board or management had authority to take such an action. E & A also argues that there is no evidence that these transfers were material to CIL's financial condition or to PCE's liability on the Guarantee. Because CIL's financial statement for the period ending December 31, 1993 shows net assets of $233,000 and the projected value of claims under the Retrocessional Agreement is

$58,769,351, CIL could not meet E & A's claims regardless of the loans to L & G.

 PCE has raised issues of fact as to whether these loans constituted inequitable conduct and as to whether E & A or its agents caused these loans to be made. Thus, PCE may present this issue to the jury.[14]

### 2. The commutations with reinsurers

Second, PCE argues that E & A and/or plaintiffs (the Scheme Administrators) entered into agreements with reinsurers to relieve them of liability for less than full payment. Under the Run–Off Agreement, TSS had the right to settle claims, subject only to the approval of E & A for claims in excess of $50,000. *See* Run–Off Agreement at ¶¶ 1, 4. PCE's consent was not required. PCE claims, however, that such settlements were not entered into by TSS but by E & A, which had no such authorization. This theory is based on the argument, discussed *supra*, that after the Section 51 Transfer, E & A was managing the run-off of the Portfolio and not TSS. It contends that this action can form the basis for a release by virtue of inequitable conduct.

The only evidence that PCE asserts in support of this theory is the testimony of Christopher Coleman, who worked for the English & American Group from 1985 to 1990, first as an accountant and later on the "Providence Capitol run-off." *See* Deposition of Christopher Coleman ("Coleman Tr.") at 12–13. Coleman testified that he recalled one commutation with a reinsurer who gave E & A a cash payment

14. The only evidence that PCE offers in opposition to the motion is that E & A's officers and directors were the same as L & G's and that they were acting on E & A's behalf. PCE proffers that it will establish at trial that the money was to be used to benefit E & A. If PCE offers credible proof to this effect, a trier of fact could conclude that E & A engaged in inequitable conduct. The question of whether this conduct was material turns on whether the trier of fact concludes that E & A repre-

sented to CIL that its maximum exposure was only Ł2 million. If it so finds, the "stripping" of CIL's remaining assets is indeed material. If the trier of fact does not find that E & A made any such representation, then the transfer of those assets, relative to a potential exposure of many millions more, is immaterial. Even if the alleged "stripping" is material, it is not yet clear that it alone would suffice to relieve PCE of its obligations under the Guarantee.

in lieu of reinsurance. *See id.* at 82. He could not remember the name of the reinsurer, when it occurred or any other details.

■ While this claim, if proved, would support a defense of inequitable conduct, PCE simply does not have sufficient evidence to prove that E & A settled with its reinsurers at the expense of PCE or to its detriment.

## III. Conclusion

For the reasons set forth above, plaintiffs' motion for summary judgment as to PCE's defenses is denied.

SO ORDERED.